[No. 27570. Department One. May 3, 1940.]

PEOPLES DRILLERS, INC., *Appellant,* v. GRANVILLE EGAN, *as Receiver, Respondent.*[1]

[1]Reported in 102 P. (2d) 242.

*Hartman, Hartman, Simon & Coles,* for appellant.

*E. P. Donnelly,* for respondent.

ROBINSON, J.—This appeal of Peoples Drillers, Inc., is from an order rejecting its claim to certain drilling machinery in possession of the receiver of Peoples Oil & Gas Development Company.

The background of the matter is as follows: Some years ago, a small group of promoters began a development of an alleged oil field in one of the arid districts of the state. Peoples Oil & Gas Company, a corporation, was organized and held a gas and oil lease of a large tract of land. Over a period of several years, fractional leases or fractional interests in the main lease were sold to thousands of people. In this way, seventy per cent of the lease interest was ultimately parceled out to the public.

During the selling campaign, another corporation was formed, Peoples Gas & Oil Development Company, to which the fractional leaseholders assigned their leases in pursuance of what the promoters called a "community plan of development." In making their assignments, the leaseholders reserved certain rights in the oil to be produced. This new company was to drill a well known as the "Donnie Boy No. 1." It was furnished with drilling machinery and commenced to drill in August, 1934.

The thousands of people who had bought fractional interests had no stock interest in the development company, or, for that matter, in any other. The development company stock was owned and controlled by two stockholders, William A. Broome and H. H. Meyers. In June, 1936, these men organized Peoples Drillers, Inc., and owned all of its stock.

On June 10, 1936, these two companies entered into a contract, the material parts of which are as follows:

"Whereas, there has been assigned to the Development Company, over a considerable period of time, a large number of small oil and gas lease areas, which in the aggregate is a large number of acres. Each of said assignors reserves certain rights in production, thus acquiring an interest in the so-called community lease arrangement of that company, which said company is engaged in drilling an oil well on said acreage. The individual assignors, however, having found the transfer of their rights to be complicated and difficult and they having had no method for any common action in any matter, and the stockholders of said corporation believing it to be in the best interests of the corporation and the said assignors, determined to bring about a reorganization of said corporation, so that all of said assignors might have the opportunity of becoming stockholders of the corporation and so that a new corporation formed under the name of Peoples Drillers, Incorporated, having stockholders substantially identical with the Peoples Gas & Oil Development Company, might take over the actual drilling operation and all of the assets of the development company excepting the leases subject to all of the liabilities, and this plan having developed over a considerable period of time, said new corporation has been organized and now is a part of this agreement, and

"Whereas the Drillers Company is intimately and fully familiar with all of the records, affairs, accounts and liabilities of the Development Company;

"Now, therefore, for and in consideration of the premises and of the stipulations of this agreement, it is now hereby mutually agreed between the parties as follows:

"(1) The Development Company shall forthwith cause to be transferred to the Drillers Company all of the assets of the Development Company except its leases and leasehold acreage and its charter, seal, minute book and records subject to all of the liabilities of the Development Company which the Drillers Company assumes and agrees to pay.

"(2) The Drillers Company shall by appropriate consideration procure the said H. H. Meyers and

William A. Broome, who are stockholders of the Development Company, to donate to the treasury of the Development Company, at an appropriate time, all the stock in said company which the said men hold and own, or should the Drillers Company be unable to effect this arrangement they shall respond by paying appropriate damages to be agreed upon.

"(3) The Drillers Company will continue the present drilling operations on the lease of the Development Company, pursuant to the terms of said lease, . . . and if such drilling be not so continued, all property of the Drillers Company on or about said drilling location shall forthwith be and become the property of the Development Company, and the Drillers Company thereupon shall on demand give a bill of sale for the same to the Development Company, free and clear of encumbrances. . . .

"(7) The Drillers Company shall receive 22½ per cent of the gross production from each well drilled hereunder, subject to deductions for production and marketing."

Mr. Broome, while on the witness stand, spoke of the purpose of the above contract, as follows:

"It was afterwards determined that the people could own their own operation. We didn't want them to own the operation and the operation's obligations, and the operation too, so the obligation for drilling the well was passed to a company organized for the purpose, Peoples Drillers."

It will be noted, however, that Broome and Meyers, as the development company, purported by this contract to pass something more to themselves, as Peoples Drillers, Inc., than the obligation to drill, that is to say, the only really tangible assets of the development company and 22½ per cent of the oil produced by drilling, if, perchance, there should be any produced.

There is no evidence that any formal transfer of the drilling machinery was made, and, of course, it remained at and about the well; but there is evidence

that Broome and Meyers, as Drillers, Inc., took possession from Broome and Meyers, as the development company, and did some drilling, the extent of which the record does not reveal.

In about four months, the original company, Peoples Gas & Oil Company, made a proposal to the development company, which we quote, in part, for the purpose of showing the intimate relationship of these three organizations:

"The Peoples Gas & Oil Company, hereinafter identified as Company A, having heretofore sold to the public leases on the Frenchman Hills structure in the state of Washington, to the extent of approximately 70% of the total acreage held under lease on that structure, at the withdrawal of its public offering of leases thereon, was the holder of approximately 30% of said leases. These leases were subsequently assigned to the Peoples Gas & Oil Development Company, hereinafter identified as Company B, in the same manner and on the same basis as individual owners of small leasehold acreage had assigned their holdings to Company B for the purpose of participating in a 'community plan of development.'

"Company A is aware that under the terms of the contract between Company B and Peoples Drillers, Inc., the development being carried on by the latter is contingent at all times upon its willingness to continue with its drilling operation, being subject in the event of default or discontinuance of operations to only the penalty stipulated in said contract.

"Company A, because of its large interest in Company B and its sales to the public heretofore referred to, is definitely interested in insuring, insofar as it is possible, the completion of a full test of said Frenchman Hills structure which by reason of most difficult drilling operations as well as unknown formations will entail a very considerable expenditure. . . .

"For the considerations hereinafter recited and for the uses and purposes herein set out, Company A hereby proposes to assign and transfer to Company B

all of its contracts receivable on acreage heretofore sold, as well as the leasehold acreage described therein, as of October 15, 1936. . . .

"It is expressly understood that all net proceeds from the collection and liquidation of said contracts receivable, after the deduction of commissions, expense necessary to keep the corporation functioning, cost of collection and liquidation of contracts and the payment of all taxes of every kind and nature including taxes, if any, ultimately assessed upon the contracts of the net proceeds thereof, shall be used for the sole purpose of drilling operations on the lands held under lease by Company B and for no other purpose, to the end that a thorough test shall be completed thereon.

. "In consideration hereof, Company A shall be entitled to a contingent participation in the gross production from each well drilled upon said structure, subject to deductions for production and marketing and future drilling on the same terms and conditions as are imposed upon community leaseholders, but solely under the following conditions: . . . but in no event shall said contingent participation be in excess of 10% of gross production."

On October 16th, the development company made a proposal to Drillers, Inc., which we quote in full:

"On the 13th day of October, 1936, Peoples Gas and Oil Company presented to us a proposal, copy of which has been transmitted to you and the same is by this reference made a part hereof. The said proposal, we believe, will bring to us, if accepted, a substantial amount of money and we prefer to conduct our own drilling operations and accordingly we submit to you the following proposal:

"(1) That the agreement of June 10, 1936, between Peoples Gas and Oil Development Company and Peoples Drillers, Inc., be terminated.

"(2) That you convey to us all machinery, tools, equipment and supplies at, about or used in connection with the well known as Donnie Boy No. 1, and that you promptly liquidate all of your obligations relative to said well and the drilling thereof.

"(3) As full compensation you shall receive 12½%

contingent participation in the gross production from each well drilled upon said structure subject to deduction for production and marketing and future drilling on the same terms and conditions as are imposed upon community leaseholders.

"(4) After the expenditure of all of the funds derived by virtue of said proposal from Peoples Gas and Oil Company and should Peoples Gas & Oil Development Company cease development operations, then and thereupon so much of the equipment hereinabove mentioned as remains shall be conveyed to Peoples Drillers, Inc., free and clear.

"(5) Should Peoples Gas and Oil Development Company at any time cease to comply with the minimum requirements for drilling of their leases on the structure, then and in that event Peoples Drillers, Inc., shall be entitled to an exclusive option to do the said minimum drilling for the compensation available from production as stated in the community lease agreement and for no other compensation.

"(6) We will covenant and agree that the requirements as to drilling personnel contained in the proposal of Peoples Gas and Oil Company, if accepted by us, will be faithfully complied with."

Drillers, Inc., accepted this proposal, and the development company—now no longer Broome and Meyers, but one composed of several thousand leaseholders—drilled for a period and until Harry C. Huse, as director of the state department of licenses, threw the company into receivership.

At the trial of this cause, the appellant proved that drilling had ceased, and demanded a conveyance of the machinery by virtue of the provisions (4) of the instrument last above quoted. The receiver produced a bill of sale, not contemporaneous with that instrument, but dated October 27, 1936, eleven days later. In this bill of sale, Peoples Drillers, Inc., conveyed to the development company the machinery involved in this controversy.

"To have and to hold the same to the second party, its successors and assigns forever. And the first party, for itself, and its successors, covenants and agrees to and with the second party, its successors and assigns, that the first party is the owner of the said property, goods and chattels and has good right and authority to sell the same, and that it will warrant and defend the sale hereby made unto the second party, its successors and assigns, against all and every person or persons whomsoever, lawfully claiming or to claim the same."

No reference whatever is made in the bill of sale to the October 13th agreement, nor is there any oral evidence to the effect that it was given pursuant thereto or that there was any connection between the two instruments.

The trial judge, in rejecting the claim at the close of the hearing, commented very briefly, stating that he did not wish to go into the matter fully, due to the fact that a trial was then going on in a Federal court in which the conduct of the participants in this promotion was being investigated from a criminal standpoint. However, in ruling upon the motion for a new trial, the judge said that he took a much simpler view of the matter than counsel, adding:

"Here were some individuals dealing with themselves, with reference to this property which really belonged to the people who paid for that; that is, who paid in the money. I think that that is the view that the court should take of it, and I think it should forget all about those instruments. I don't think they have any force. I don't think they have any validity. I think it was just simply a subterfuge to cover up among the officers of the corporation. I think for that reason the motion shall be denied."

In support of the trial court's view, the respondent points out that the first receiver appointed for the development company testified that he had made a study of the history and the records of the three companies;

that all of their records were kept in the same office and by the same people; and that all three companies were dominated by the original promoters of the lease selling company, Simons, Markowitz, and Emerson, who were the officers of that company and controlled the other two companies by personal domination of Broome and Meyers.

It is argued that, in order to keep the sales going, drilling had to be done. The development company was organized for that purpose. Drilling machinery was furnished to that company, of which Broome and Meyers were the sole stockholders.

The fractional leaseholders became restive. They had assigned their leases to the development company and had nothing tangible to show for their investments. It was decided to permit them to become stockholders in the development company. But before they were allowed to become so, the only real assets of that company, the drilling machinery, was taken out of it and placed in Peoples Drillers (Broome and Meyers).

Next, Peoples Gas & Oil Company offered inducements to the development company to take back the obligation to drill, these inducements being the investors' own unpaid obligations on their purchase contracts of the fractional leases. It was provided that these receipts must be used for drilling, and the Peoples Gas & Oil Company reserved a part of the production, if there should be any production. Peoples Drillers then returned the obligation to drill to the development company, and the machinery also, but upon these terms: If the development company should strike oil, Peoples Drillers should have 12½ per cent of the production; but if they did not, and drilling should stop, Peoples Drillers could step in and repossess the machinery. That is what it is attempting to do in this **action.**

The trial court's decision, we take it, was based upon the view that Peoples Drillers was organized for the purpose of keeping a semblance of life and activity in a fraudulent promotion that was beginning to bog down, and for the additional purpose of getting the machinery where it could be readily salvaged if and when the state authorities moved in.

■ Appellant, we think, mistakenly assumes that the trial court's decision was based upon the theory that, on October 16, 1936, the development company was the *alter ego* of Peoples Drillers, Inc.; for it has devoted the major portion of its briefs to demonstrating, by argument and citations, that this cannot be true. If the technical doctrine of *alter ego* was consciously applied by the trial judge in arriving at his decision, he undoubtedly applied it as of the date of June 10th. On that date, the sole stockholders of these two companies were Broome and Meyers.

The trial court was evidently of the opinion that the contract of June 10, 1936, was, in effect, a contract between Broome and Meyers, representing the promoters, and Broome and Meyers, representing the promoters, and, therefore, a sham contract entered into as one of the steps in keeping alive and carrying out a fraud on the public. If this contract was ineffective, or, as the trial court said, "a mere subterfuge," the title to the machinery never left the development company. In our opinion, there is sufficient evidence in the record to support that conclusion.

The order appealed from is affirmed.

BLAKE, C. J., MAIN, MILLARD, and SIMPSON, JJ., concur.